**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| THE ONLI CORPORATION, DHRYL ANTON, and MICHAELA KATHERENS ANTON, <br><br>        Plaintiffs, <br><br>      v. <br><br> THOMAS GRIFFIN, <br><br>        Defendant. | Civil Action No.  2:26-cv-07916 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

WEINER LAW GROUP LLP
*Attorneys for Plaintiffs*
629 Parsippany Road
Parsippany, NJ 07054
(973) 403-1100

Of counsel and on the Brief:

    Christopher J. Seelinger, Esq.
    Paul S. Grossman, Esq.

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ..................................................................................................2

**STATEMENT OF FACTS**........................................................................................................3

    A.    The Parties.........................................................................................................................3

    B.    Onli's Intellectual Property Assets....................................................................................3

    C.    Griffin Begins his Racist Harassment Campaign...............................................................4

    D.    Griffin Expands his Impersonation and Harassment of Onli..............................................7

    E.    Griffin's Doxing and Attempted Hacking.........................................................................8

    F.    Griffin Threatens Violence Against the Anton Family......................................................10

**LEGAL ANALYSIS** ................................................................................................................10

**ARGUMENT**............................................................................................................................11

    I.    Onli is Likely to Succeed on the Merits of its Claims ......................................................11

        A.    Griffin's counterfeit channels infringe upon Onli's Registered Trademarks
...................................................................................................................................11

            1.    Onli owns a valid, protectable mark.........................................................11

            2.    Griffin's use of an identical mark is likely to cause confusion. ...................12

        B.    Griffin's False Designations of Origin Constitute Further Lanham Act
Violations................................................................................................................12

        C.    Defendant has engaged in cybersquatting in violation of the ACPA ...................14

            1.    Griffin's ONLI-formative domains violate 15 U.S.C. § 1125(d)................14

            2.    Griffin's registration of the individual Plaintiffs' names violates 15
U.S.C. § 8131 ..........................................................................................15

            3.    Plaintiffs are entitled to cybersquatting injunctive relief .............................16

        D.    Griffin's hacking campaign violates federal and state computer abuse
statutes ...................................................................................................................16

        E.    There is overwhelming evidence of Griffin's tortious conduct under New
Jersey law...............................................................................................................19

    II.    Plaintiffs will Suffer Irreparable Harm Absent an Injunction.......................................23

    III.    The Balance of the Equities Favors Plaintiffs..............................................................24

    IV.    An Injunction Serves the Public Interest.......................................................................24

    VII.    The Proposed Injunctive Relief is Proper and Readily Enforceable.............................24

**CONCLUSION** .......................................................................................................................27

i

## TABLE OF AUTHORITIES

**Cases**

A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,
  237 F.3d 198 (3d Cir. 2000)............................................................................11, 12

Bisbee v. John C. Conover Agency, Inc.,
  186 N.J. Super. 335 (App. Div. 1982) ...................................................................20

Buckley v. Trenton Saving Fund Society,
  111 N.J. 355 (1988) ...............................................................................................22

Dairy Stores, Inc. v. Sentinel Publishing Co.,
  104 N.J. 125 (1986) ...............................................................................................19

DeAngelis v. Hill,
  180 N.J. 1 (2004) ...................................................................................................19

Elliott v. Kiesewetter,
  98 F.3d 47 (3d Cir. 1996)........................................................................................27

Faber v. Condecor, Inc.,
  195 N.J. Super. 81 (App. Div. 1984) ....................................................................21

Friedman v. Martinez,
  240 N.J. 449 (2020) ...............................................................................................21

Goydos v. Rutgers, State Univ.,
  2024 WL 1329253 (D.N.J. Mar. 28, 2024)............................................................18

Green v. Fornario,
  486 F.3d 100 (3d Cir. 2007).....................................................................................15

Hennessey v. Coastal Eagle Point Oil Co.,
  129 N.J. 81 (1992) .................................................................................................20

Interpace Corp. v. Lapp, Inc.,
  721 F.2d 460 (3d Cir. 1983)...............................................................................12, 13

Kos Pharms., Inc. v. Andrx Corp.,
  369 F.3d 700 (3d Cir. 2004)................................................................................23, 24

Reilly v. City of Harrisburg,
  858 F.3d 173 (3d Cir. 2017)......................................................................................11

Romaine v. Kallinger,
  109 N.J. 282 (1988) ..........................................................................................20, 21

Shields v. Zuccarini,
  254 F.3d 476 (3d Cir. 2001).....................................................................................14

Temple Univ. v. White,
  941 F.2d 201 (3d Cir. 1991).....................................................................................27

W.J.A. v. D.A.,
  210 N.J. 229 (2012) ...............................................................................................20

Winter v. Natural Res. Def. Council, Inc.,
  555 U.S. 7 (2008)....................................................................................................11

# TABLE OF AUTHORITIES (CONT.)

**Statutes, Rules, and Other Authorities**

15 U.S.C. § 1114............................................................................................11, 13

15 U.S.C. § 1116(a) .......................................................................................16, 23

15 U.S.C. § 1125(a) ........................................................................................11, 13

15 U.S.C. § 1125(a)(1)(A) ....................................................................................13

15 U.S.C. § 1125(d) .......................................................................................14, 15

15 U.S.C. § 1125(d)(1)(B)(i) ................................................................................15

15 U.S.C. § 1125(d)(1)(C) ....................................................................................16

15 U.S.C. § 8131.......................................................................................14, 15, 16

15 U.S.C. § 8131(1)(A)..........................................................................................15

15 U.S.C. § 8131(2) ...............................................................................................16

15 U.S.C. §§ 1057(b), 1115(a)...............................................................................11

18 U.S.C. § 1030.............................................................................................17, 18

Anticybersquatting Consumer Protection Act ("ACPA").....................................14, 15

Computer Fraud and Abuse Act ("CFAA")...........................................................17, 18

Fed. R. Civ. P. 65(b) ..............................................................................................27

Fed. R. Civ. P. 65(d) ..............................................................................................24

Lanham Act..............................................................................11, 12, 14, 15, 16, 23

N.J.S.A. 2A:38A-1, et seq......................................................................................17

N.J.S.A. 2A:38A-3(c) ............................................................................................18

New Jersey Computer Related Offenses Act ("NJCROA") ...................................17, 18

Rule 65 ...............................................................................................................26, 27

iii

## PRELIMINARY STATEMENT

Immediate injunctive relief is necessary to protect the Plaintiffs—the Onli Corporation, a financial-technology company, together with its CEO Dhryl 'Doc' Anton ("Dhryl") and his wife, COO Michaela Kathrens Anton ("Michaela")—from Defendant's outrageous campaign of harassment and extortion which continues to cause irreparable harm.  The defendant is Thomas 'Tom' Griffin, a jilted technology consultant with a self-described "crazy" and "vindictive" personality, who applied to work for Onli after (as was later learned) he had been repeatedly fired from other positions for posting utterly repugnant videos online.  After being rejected by Onli, Griffin has resorted to a campaign of brazen criminal harassment: he is impersonating Onli and its executives on major platforms like YouTube and LinkedIn, using its registered trademarks, marketing material, and its employee's personally identifiable information and likenesses.  Griffin's fake accounts and web pages use Plaintiffs' names and intellectual property to initially appear authentic, but go on to post a wide variety of harmful content: from defamatory statements about Onli, to sensitive personal information about its executives, to racist AI-generated depictions of Dhryl and his family.  This application is Plaintiffs' last hope to end this madness.

Griffin's own statements provide the motive and purpose of this grotesque harassment.  In emails to Plaintiffs, he claims credit for the campaign and has repeatedly demanded payment in exchange for ending it.  Over the past few weeks, Onli has attempted to remove Griffin's imposter accounts with takedown requests.  However, within a day or two of each takedown, Griffin would redouble his efforts—making new accounts and new "content" for each one taken down.  Griffin's harassment campaign has also expanded far beyond impersonation, including the attempted theft of Onli credentials and recording drone footage of Dhryl and Michaela's home.

1

The evidence provided here will speak for itself.  This application for an interlocutory injunction is necessary to end Griffin's expansive, racist, and grotesque harassment campaign.

## STATEMENT OF FACTS

### A.  The Parties

Onli is a Delaware corporation with its principal place of business in Henderson, Nevada. It develops and markets a platform for storing and transferring digital assets.  (Verified Compl. ¶ 6).  Dhryl and Michaela are husband and wife and reside in Scottsdale, Arizona.  Dhryl is Onli's founder and chief executive officer, and Michaela is its chief operating officer.  Michaela also manages Onli's response to the conduct described here and is the Plaintiffs' principal contact for this matter.  (Verified Compl. ¶¶ 7–8).  Ian McFall is Onli's chief technology officer.  (Verified Compl. ¶ 9).

Griffin is not a stranger to Onli.  Griffin presented himself to Onli in 2022 as a software-engineering contractor and received temporary developer access to Onli's systems and materials before the relationship ended.  The latest voter registration data shows a New Jersey address for Griffin and he has contacted Onli from, and Onli has contacted him, at a New Jersey telephone number.  Griffin is thus believed to reside in New Jersey and this action is brought in the district of his residence.  (Verified Compl. ¶¶ 10, 13–14).

### B.  Onli's Intellectual Property Assets

Onli owns a series of registered trademarks that have been infringed by Griffin.  First and foremost is U.S. Trademark Registration No. 5,932,330 for the standard-character mark (i.e., "word mark") "ONLI", registered on the Principal Register on December 10, 2019, in International Class 9 for computer software and platform services relating to the creation, storage, and transfer of digital tokens and virtual currencies.  (Verified Compl. ¶ 15; Ex. A).

2

Onli's protectable intellectual property also includes the videos that Griffin copied, as well as its promotional videos, logo, branded imagery, and its website and marketing text. Its authentic online presence includes the domains onli.one, onli.ai, onli.cloud, and onli.you, and the contact address hello@theonlicorporation.com. (Verified Compl. ¶ 16).

Onli also maintains portions of the source code for its services on GitHub, a platform that allows for hosting, editing, collaborating, and updating projects that use computer code. (Verified Compl. ¶ 17).

### C. Griffin Begins his Racist Harassment Campaign

In mid-May 2026, Griffin began sending disgusting, racist text messages with disparaging AI-generated content targeting Dhryl, to Onli executives and their families:



(*See* Exhibit B; Verified Compl. ¶ 18). Yet, this was only the opening salvo of Griffin's vile campaign.

In late May 2026, a YouTube channel calling itself "The Onli Corporation Video Vault," which used the handle @onlicorporation and held itself out as Onli's official Youtube channel, began uploading dozens of videos. The channel used the ONLI mark and Onli's full company name in its title and handle, reproduced Onli's tagline and marketing copy, and linked to Onli's genuine websites—onli.one, onli.ai, onli.cloud, and onli.you—to reinforce the impression that it was the real company. The channel went as far as to spoof Onli's authentic contact address ("hello@theonlicorporation.com") with a near-identical knockoff ("hello@onlicorporation.com"). Yet, after presenting itself as Onli's authentic Youtube channel, the rest of the channel was filled with dozens of offensive titles and disparaging content created to attack Onli's reputation. (Ex. C; Verified Compl. ¶¶ 19–21).

The damage was immediate. Scott Ferguson, the managing member of Lucra Financial LLC, one of Onli's business partners, was the first to notice the fake Onli channel, which made a false statement concerning that partnership and was published in a manner not authorized by Lucra. (*See* Declaration of Scott Ferguson, Ex. D). Naturally, Lucra was confused by fake Onli channel and contacted Onli with serious concerns and Griffin's conduct threatened a new deal that Onli is negotiating with Lucra. (*Id.*) As illustrated below, Griffin uploaded a variety of videos under disparaging titles and racist depictions of the Anton family:

4



(Excerpts from Exhibit C; Verified Compl. ¶ 21).  The channel also published sensitive private information, including   an Onli bank-account number, in the video descriptions.  (*See* Ex. C; Verified Compl. ¶ 21).

Onli filed a series of reports with Youtube, starting on May 29, 2026, requesting a removal of Griffin's fake Onli channel for trademark and other violations of law.  YouTube eventually removed that channel early on Saturday, June 13, 2026.  The relief was short-lived.

**D. Griffin Expands his Impersonation and Harassment of Onli**

Within hours of the Youtube channel being taken down, Griffin emailed Onli and acknowledged his channel's removal while taunting Onli with links to new pages impersonating and harassing Plaintiffs with racist and profane AI-generated depictions of Dhryl and his family:



(Exhibit E; Verified Compl. ¶ 24).    Meanwhile, on LinkedIn, a fake company page (linkedin.com/company/onli-corporation) posed as Onli's official presence while engaging in the same pattern of deception: it used Onli's name, website, industry, and size – but then went on to use fake logos and a Scottsdale street address that was, in fact, the Antons' home address. A profile impersonating Onli's CEO appeared as well (https://www.linkedin.com/in/dhryl-anton), claiming to be "Dhryl Anton—Founder & CEO at Onli" and using his photograph and biographical details. Griffin used those accounts to send out connection requests and make fake news posts intended to damage Onli's reputation.  (Verified Compl. ¶ 25; Ex. K).  Most recently, one of Onli's largest clients noticed the videos being posted by the fake Dhryl account and contacted Onli with concerns.  (Verified Complaint, ¶ 26; Ex. L).  Griffin's conduct continues to cause irreparable damage to Plaintiffs' reputation.

6

Yet, it doesn't end there.  Griffin has also taken to creating fake Dhryl accounts on pornographic websites such as "OnlyFans" and "Snifffr," a website that advertises itself as a marketplace to buy and sell used underwear. (Ex. G; Verified Compl. ¶ 27).  Griffin has demanded payment to close those accounts and Dhryl holds deep spiritual beliefs that render these accounts to be particularly emotionally distressful to him. (*See* Verified Complaint, ¶ 27).

### E.  Griffin's Doxing and Attempted Hacking

Griffin's course of illegal conduct reaches beyond the counterfeit channels, with documented attempts to steal sensitive data from Onli's systems and dox its employees.  He has published the Anton family's home address on the counterfeit LinkedIn page, posted an Onli bank account number in YouTube video descriptions, and sent apparent drone surveillance of their home to them via text message:



(Exhibit H; Verified Compl. ¶ 28).   Griffin also registered a series of domains using the names Onli and its executives (including "onlitoken.com", "dhrylanton.org", "ianmcfall.org", and "katherineanton.com"; *see* Ex. I; Verified Compl. ¶ 29), demanded a payment to transfer those domains to Plaintiffs, asserting that "buying domains isn't a crime.  Putting them up for sale also isn't a crime." (Ex. I; Verified Compl. ¶ 30).

7

If that wasn't enough, Griffin also sent a video demonstrating his attempt to steal credentials and other sensitive information from Onli's GitHub pages.  He sent Plaintiffs a roughly four-minute screen recording showing a custom computer script scraping 26 repositories from Onli's GitHub account "OnliSyn".  The script—bannered "PWN DHRYL ANTON," run from a working directory named "doc-got-raped"—created a copy of every repository and ran two programs (TruffleHog and Gitleaks) that are designed to identify "secrets"[1] (sensitive digital credentials) hidden in Onli's computer code. (Ex. J; Verified Compl. ¶ 31).  Griffin sent the recording to Onli to indicate that he found such secrets, which could potentially expose Onli or its clients to significant losses arising from stolen credentials, all for the purpose of attempting to blackmail Onli for personal gain.  (Verified Compl. ¶ 32).

Griffin removed any doubt about his motivation in a subsequent email to Dhryl:  he admitted to everything, claimed that he was in possession of sensitive information that he pilfered from Onli's GitHub repositories, all while showcasing a fresh round of impersonation and harassment and then demanding payment to put an end to it:



---

[1] For additional background on "secrets" in computer code, the following articles explain their significance: https://www.ibm.com/think/topics/secrets-management (secrets are credentials for privileged accounts and a "high value target" for hackers); https://blog.codacy.com/hard-coded-secrets ("if exposed, they can compromise your system's integrity and confidentiality").

(Excerpts from Exhibit G; Verified Compl. ¶ 34; at the time, .388 BTC was equal to more than $25,000).  This is a textbook example of extortion and warrants immediate injunctive relief for Plaintiffs.

**F.  Griffin Threatens Violence Against the Anton Family**

On the morning of this filing, Griffin's campaign of escalation gave way to a thinly veiled threat of physical violence.  In a June 29, 2026 email to Dhryl and Michaela that Griffin framed as his "last" attempt to strike a deal, he warned that if Plaintiffs would not pay him, what he was "most concerned about is the fact that [he] know[s] how dark web bounties work," explaining that "the person only gets paid if they accomplish the goal."  Griffin then boasted that he "had a team of guys swatting a close friend of mine and their entire family," claimed he "saw firsthand how brutal these guys are," and warned that "everyone's inside the blast radius of this thing"— sweeping Plaintiffs' landlords, business partners, and employees within his reach.  (Exhibit M; Verified Compl. ¶¶ 38–40).  Coming from a man who has already surveilled the Antons' home by drone and published their home address, these statements are not mere bluster; they place Dhryl and Michaela in fear for their physical safety and make the need for immediate, protective relief all the more urgent.

With each failed attempt to extort Plaintiffs, Griffin's tactics have escalated, and thereby pose ever greater threats to Plaintiffs' reputation and the safety and well-being of Onli's employees.  Plaintiffs' need for interlocutory injunctive relief is self-evident.  The next section will analyze the relevant law and how it shapes the scope of that relief.

## LEGAL ANALYSIS

A temporary restraining order and a preliminary injunction are governed by the same four-factor test.  The moving party must show (1) a likelihood of success on the merits and (2) that it is

9

likely to suffer irreparable harm without relief.  If it makes both threshold showings, the court then weighs (3) the balance of the equities and (4) the public interest.  Reilly v. City of Harrisburg, 858 F.3d 173, 176, 179 (3d Cir. 2017); Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The first two factors are the "most critical"; only after the movant carries them does the court reach the last two and "balance[] all four."  Reilly, 858 F.3d at 179.  Regardless, we address each factor below and note that—if there is any silver lining to Griffin's disgusting behavior—it would be that it presents this Court with an easy decision on these factors.

## ARGUMENT

### I. Onli is Likely to Succeed on the Merits of its Claims

#### A. Griffin's counterfeit channels infringe upon Onli's Registered Trademarks

To prove infringement of a registered mark under § 1114, Onli must show that it owns a valid, legally protectable mark and that Griffin's use of that mark is likely to cause consumer confusion.  A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000).  The claims share these elements; the principal difference is that § 1114 protects registered marks while § 1125(a) reaches unregistered marks and broader passing-off.  Regardless, Onli easily satisfies both Lanham Act claims.

##### 1. Onli owns a valid, protectable mark.

Onli's federal registration of the ONLI mark is "prima facie evidence of the validity of the registered mark," of Onli's ownership, and of its "exclusive right to use the registered mark in commerce." 15 U.S.C. §§ 1057(b), 1115(a).  That registration establishes the first element of both claims.  Griffin has no competing claim to the mark; his channels use the identical term to identify the identical services. (Ex. C; Verified Compl. ¶ 43).

10

**2. Griffin's use of an identical mark is likely to cause confusion.**

Where an alleged infringer uses a mark identical to the registered mark for identical services, confusion is especially likely, and a detailed factor-by-factor analysis is unnecessary. See A&H Sportswear, 237 F.3d at 214–15. That is the case here. Griffin did not adopt a similar name; he used ONLI itself, paired with Onli's full company name, logo, and tagline, and linked to Onli's real websites, on channels that announced themselves as Onli's official presence. (Ex. C; Verified Compl. ¶ 20).

The Third Circuit's Lapp factors yield the same conclusion. Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983). The marks are not merely similar but identical; Onli's mark is distinctive; the counterfeits target the same audience—Onli's actual customers and investors— through the same channels; and Griffin intended to confuse, copying Onli's branding wholesale and linking to Onli's genuine sites precisely so that viewers would confuse it for the real thing. (Verified Compl. ¶¶ 44–45; Ex. C).

Griffin's deception is already operating among the people Onli deals with: the fake "Dhryl Anton" profile reached Onli's own employees through Griffin's connection requests. Lucra Financial, who is negotiating a major agreement with Onli, noticed these fake Onli accounts and initially believed they were authentic. (Ferguson Declaration, Ex. D; Verified Compl. ¶¶ 25, 44). Because Griffin used an identical mark for identical services for the purpose of being mistaken for Onli, Onli has shown a likelihood of confusion, and thus a likelihood of success, on its registered-trademark claims.

**B. Griffin's False Designations of Origin Constitute Further Lanham Act Violations**

Section 1125(a) likewise imposes liability on anyone who, in connection with goods or services, uses a false designation of origin or a false or misleading representation of fact likely to

cause confusion "as to the affiliation, connection, or association" of one person with another, or "as to the origin, sponsorship, or approval" of goods, services, or commercial activities.  15 U.S.C. § 1125(a)(1)(A).  The claim requires the same two showings as the § 1114 claim (a protectable interest and a likelihood of confusion measured by the Lapp factors), but it is not limited to Onli's registered trademarks.

Griffin has falsely designated the origin of his counterfeit channels by copying Onli's whole presentation, not merely its name. The counterfeit YouTube channel and LinkedIn page reproduce marketing copy, imitate Onli's genuine corporate announcements, and list Onli's real website, industry, and size—all presented as Onli's "official" presence.  Thus, beyond Onli's registered word mark, Griffin's fake accounts copy the slogans, content, executive's names, and other signals of authenticity that the public associates with Onli to convey the single fraudulent message that these are authentic channels. Section 1125(a) forbids precisely that false designation of origin, which extends beyond Griffin's infringement of the registered Onli trademarks.  (Exs. C, K; Verified Compl. ¶¶ 20, 25, 47–48).

Detailed analysis is unnecessary where, as here, the confusion that § 1125(a) forbids (as to affiliation, connection, sponsorship, and approval), is plainly the goal of Griffin's unlawful conduct.  The fake channels and profiles are built to make customers, investors, and counterparties believe they are dealing with Onli or its executives.  Thus it comes as no surprise that, shortly before this filing, one of Onli's largest clients noticed the fake "Dhryl" YouTube account and contacted Onli with concerns about what was being posted.  (Verified Compl. ¶¶ 26, 49; Ex. L). Accordingly, Onli is also nearly certain to succeed under § 1125(a) on grounds independent of its registered-mark claim.

12

**C. Defendant has engaged in cybersquatting in violation of the ACPA**

Griffin's domain-name registrations independently entitle Plaintiffs to relief under the Anticybersquatting Consumer Protection Act ("ACPA"), an addition to the Lanham Act codified as 15 U.S.C. § 1125(d). Griffin has admitted to registering a series of domain names built on Onli's mark and on the names of its executives—including onlitoken.com, dhrylanton.org, ianmcfall.org, and katherineanton.com—and then demanding payment to hand them over, insisting that "buying domains isn't a crime [and] [p]utting them up for sale also isn't a crime." (Exs. I, G; Verified Compl. ¶¶ 29–30).  What it is, is cybersquatting in two distinct, separately actionable forms: the registration of marks, 15 U.S.C. § 1125(d), and the registration of the names of living persons, 15 U.S.C. § 8131.

**1. Griffin's ONLI-formative domains violate 15 U.S.C. § 1125(d)**

To prevail under § 1125(d), a plaintiff must show that (1) its mark is distinctive or famous, (2) the defendant's domain name is identical or confusingly similar to that mark, and (3) the defendant registered or used the domain with a bad-faith intent to profit from the mark.  Shields v. Zuccarini, 254 F.3d 476, 482 (3d Cir. 2001). Onli easily satisfies each element.

The first two elements follow directly from the registered trademark analysis above.  Onli's wordmark is federally registered and inherently distinctive, and Griffin's domains—onlitoken.com and the other ONLI-formative names identified in Exhibit I—incorporate the ONLI mark in its entirety, adding only generic or pejorative terms. Wholesale incorporation of a distinctive mark, paired with such add-ons, is the paradigm of a domain that is "confusingly similar" under the Act. See Shields, 254 F.3d at 483–84 (intentional minor variations of a distinctive mark in a domain name are confusingly similar).

13

Griffin's bad-faith intent to profit is equally clear.  The Lanham Act lists nine non-exclusive factors bearing on bad faith, 15 U.S.C. § 1125(d)(1)(B)(i), and they point in one direction here: Griffin has no trademark or other intellectual-property rights in ONLI (factor I); the domains are not his name (factor II); he made no bona fide prior or noncommercial use of them in connection with any goods or services (factors III–IV); he registered them to divert and tarnish under cover of confusion (factor V); he registered a series of such names (factor VIII); and—decisively—he acquired them not to use them but to sell them to Onli for a windfall (factor VI). The Third Circuit has described such conduct as "a quintessential act of cybersquatting." Green v. Fornario, 486 F.3d 100, 105 (3d Cir. 2007) (referring to "registering the site www.dupont.com with the hope of selling it to E.I. du Pont de Nemours and Company for an exorbitant price"). Griffin's own emails admit that he registered these domains intentionally for the purpose of re-selling them and has repeatedly threatened to use such domains to host the same sort of offensive content that he has posted elsewhere.  (*See* Ex. I; Verified Compl. ¶ 30).  Griffin may be right that "[p]utting them up for sale . . . isn't a crime" (Ex. I), but his stated plan to ransom the domains is plainly illegal under the ACPA.

### 2. Griffin's registration of the individual Plaintiffs' names violates 15 U.S.C. § 8131

Congress separately prohibited the cybersquatting of personal names. 15 U.S.C. § 8131 makes liable "[a]ny person who registers a domain name that consists of the name of another living person, or a name substantially and confusingly similar thereto, without that person's consent, with the specific intent to profit from such name by selling the domain name for financial gain to that person or any third party." 15 U.S.C. § 8131(1)(A). Unlike § 1125(d), the provision protects a personal name whether or not it functions as a trademark.

14

Griffin's conduct is a model example for what these provisions outlawed. He registered dhrylanton.org and katherineanton.com—domains consisting of the names of the individual Plaintiffs, Dhryl Anton and Michaela Kathrens Anton—without their consent, and he did so for the specific purpose of selling them, demanding payment to transfer the domains as part of the same scheme. (*See* Ex. I; Verified Compl. ¶¶ 55–56). His registration of ianmcfall.org, using the name of Onli's Chief Technology Officer, further confirms the pattern. The question of intent is also indisputable: Griffin's emails on the subject include outright admissions of his bad-faith intent to profit. (*See* Ex. I; Verified Compl. ¶ 56). Accordingly, Dhryl and Michaela are each therefore also likely to prevail under § 8131.

### 3. Plaintiffs are entitled to cybersquatting injunctive relief

Under both of the aforementioned cybersquatting laws, the court has authority to order the forfeiture, cancellation, or transfer of the offending domains and may enjoin Griffin from registering or trafficking in others like them. (*See* 15 U.S.C. §§ 1125(d)(1)(C), 8131(2)). Because the cybersquatting claims arise under the Lanham Act, they also carry the same statutory presumption of irreparable harm on a showing of likelihood of success, 15 U.S.C. § 1116(a). The interlocutory relief included in Plaintiffs' Order to Show Cause is tailored to that likely outcome by requiring that Griffin hold the domains in place for transfer pending final judgment.

## D. Griffin's hacking campaign violates federal and state computer abuse statutes

To recount: Griffin has repeatedly accessed, or attempted to access, Onli's computer systems to obtain information that he could use to extort the Plaintiffs. He sent Onli a recording of a custom script, operating from a root folder bearing the name "tomg/doc-got-raped", that he ran against Onli's GitHub organization to harvest "secrets," valuable digital credentials that could

15

unlock access to sensitive computer systems (Ex. J; Verified Compl. ¶ 31); Griffin then indicated that he had obtained sensitive information and demanded payment. (Ex. G; Verified Compl. ¶ 34).

That conduct violates, and warrants injunctive relief under, the federal Computer Fraud and Abuse Act (18 U.S.C. § 1030), and the New Jersey Computer Related Offenses Act (N.J.S.A. 2A:38A-1, *et seq.*).

**The Computer Fraud and Abuse Act ("CFAA").** The CFAA prohibits several forms of computer crime, including intentionally accessing a protected computer without authorization to obtain information (18 U.S.C. § 1030(a)(2)), using such access to further a fraud (18 U.S.C. § 1030(a)(4)), and threatening, with an intent to extort, to damage or obtain information from a protected computer or otherwise demanding money in relation to such damage (18 U.S.C. § 1030(a)(7)). Critically, the CFAA is extended to any person who "conspires to commit or attempts to commit an offense under subsection (a)." 18 U.S.C. § 1030(b). For remedies, the CFAA provides any person who suffers a qualifying loss a civil action for damages and for "injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

Under the facts established here, Onli readily meets the criteria and definitions required to seek relief under the CFAA. For starters, there is no question that Onli's GitHub repositories are in a "protected computer" (18 U.S.C. § 1030(e)(2)), as Onli's repositories and related internal systems are used in interstate commerce to promote and raise awareness of Onli's services nationwide across the United States. (*See* Verified Complaint, ¶¶ 17, 59). With respect to the statute's "$5,000" loss threshold (18 U.S.C. § 1030(c)(4)(A)(i)(I)), Onli's costs in responding to Griffin's intrusion attempt, which include investigating the attempted hacking, taking their GitHub repositories offline, and taking protective measures to limit the scope of harm from any potentially exposed credentials, easily exceed that amount. (*See* Verified Complaint, ¶¶ 33, 62). Finally,

16

although Onli's investigation is ongoing, there is currently no evidence that Griffin was able to access Onli's internal computer systems or its secrets through GitHub.  (Verified Compl. ¶ 32).

Accordingly, Onli's request for injunctive relief stems from Griffin's attempt to hack into Onli's systems (in violation of 18 U.S.C. § 1030(b)), and Griffin's subsequent extortion and threats to damage Onli's protected computer systems (in violation of 18 U.S.C. § 1030(a)(7)).  Even at this early stage, the evidence of Griffin's CFAA violations is axiomatic: between Griffin's purpose-built and malicious secret-scraping software, the related video, and the related extortion communications, Onli has established a likelihood of success for its CFAA claims.  (Exs. G, J).

Interlocutory injunctive relief is necessary to preserve the status quo and prevent Griffin from engaging in conduct that would render any subsequent CFAA injunction meaningless. Onli thus requests an order that Griffin not use, transmit, or publish any secrets obtained from Onli's protected computers, not engage in any unauthorized access of those computers, to identify and return any such secrets to Onli, and refrain from any further extortion concerning Onli's secrets.

**The New Jersey Computer Related Offenses Act ("NJCROA").** This statute covers an even broader scope of conduct than the CFAA. It affords a civil action to any "person or enterprise damaged in business or property" as a result of, among other things, "[t]he purposeful or knowing, and unauthorized accessing or attempt to access any computer, computer system or computer network."  N.J.S.A. 2A:38A-3(c) (emphasis added). A claim under the NJCROA has no monetary loss threshold and is established here under the same analysis provided in the CFAA section above. *See* <u>Goydos v. Rutgers, State Univ</u>., 2024 WL 1329253, at \*6 (D.N.J. Mar. 28, 2024) ("Courts have interpreted CROA 'in harmony with its federal counterpart,' the CFAA").

17

**E. There is overwhelming evidence of Griffin's tortious conduct under New Jersey law**

Griffin has published the home address of Onli executives; made vile, racist depictions of Dhryl and his family; harassed Dhryl's relatives with AI-generated images depicting Dhryl as a pedophile; and circulated drone footage of the Antons' residence. (Exs. B, C, H, K; Verified Compl. ¶¶ 18, 21, 25, 28). These and other despicable acts establish that Plaintiffs are likely to succeed on several New Jersey tort claims, which broaden and otherwise independently support the injunctive relief requested. The defamation claim is asserted by Onli, as to its business reputation, and by Dhryl, as to himself; the false-light and appropriation claims, which arise from Griffin's impersonation of Dhryl, are asserted by Dhryl; and the privacy and emotional-distress claims, which redress personal injuries that a corporation cannot itself sustain, are asserted by Dhryl and Michaela.

**Defamation (Onli and Dhryl).** A defamation plaintiff must prove (1) a false and defamatory statement of fact concerning the plaintiff, (2) the unprivileged publication of that statement to a third party, and (3) fault amounting at least to negligence. DeAngelis v. Hill, 180 N.J. 1, 12–13 (2004). A corporation may sue to protect its business reputation. Dairy Stores, Inc. v. Sentinel Publishing Co., 104 N.J. 125 (1986). Griffin's conduct meets every element. He published false assertions of fact—fabricated "news" posts and disparaging, false video titles and descriptions attacking Onli's integrity, and, as to Dhryl, depictions conveying that he is a pedophile. These statements are not protected "epithets, insults, [or] name-calling," DeAngelis, 180 N.J. at 14; they are false factual assertion of criminality and corporate wrongdoing. Griffin published them broadly—on YouTube and LinkedIn and through posts and connection requests aimed at Onli's customers and investors. Griffin knew the statements were false and published them to inflict harm. (Exs. C, K, L; Verified Compl. ¶¶ 67–68). The depiction of Dhryl as a criminal is defamatory *per se* as an imputation of a serious crime and of serious sexual misconduct,

18

so injury to reputation is presumed and no proof of special damages is required. <u>W.J.A. v. D.A.</u>, 210 N.J. 229, 239 (2012). Onli's injury is evident by the disparagement of its integrity before the very audience on which its business depends.

**Invasion of privacy (Dhryl and Michaela).** New Jersey recognizes a cause of action for giving publicity to another's private life, which requires proof that (1) the matters disclosed were genuinely private, (2) their disclosure would be highly offensive to a reasonable person, and (3) the public has no legitimate interest in them. <u>Bisbee v. John C. Conover Agency, Inc.</u>, 186 N.J. Super. 335, 339–40 (App. Div. 1982); *see* <u>Romaine v. Kallinger</u>, 109 N.J. 282 (1988). Griffin published the Anton family's home address and financial-account information and circulated apparent drone footage of their home. (*See* Exs. C, H, K; Verified Compl. ¶ 71). A person's home address, account information, and images of their private residence are paradigmatically private; broadcasting them on YouTube and LinkedIn supplies the publicity the tort requires; and their exposure—joined to racist threats and surveillance—would be highly offensive to any reasonable person. No legitimate public interest is served by revealing a private individual's home address or account numbers; rather, the disclosure serves only Griffin's campaign of intimidation. Dhryl and Michaela are therefore likely to succeed on this claim.

**Intrusion upon seclusion (Dhryl and Michaela).** The intrusion branch of the privacy tort reaches one who "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or [the other's] private affairs," in a manner "highly offensive to a reasonable person." <u>Hennessey v. Coastal Eagle Point Oil Co.</u>, 129 N.J. 81, 94–95 (1992). Unlike the disclosure claim, intrusion requires no publication; the wrong is the invasion itself. The "highly offensive" element is satisfied for the reasons just stated. The element unique to this tort—an intentional intrusion into Dhryl and Michaela's private sphere—is met by Griffin's drone surveillance of their home, a

deliberate use of technology to observe a space in which they plainly expect privacy. (Ex. H; Verified Compl. ¶¶ 28, 74).*See* Friedman v. Martinez, 240 N.J. 449 (2020). Surveilling and recording a private residence by drone is precisely the intentional, highly offensive intrusion the tort forbids.

**False light (Dhryl).**  A false-light plaintiff must show that the defendant gave publicity to a matter that places him before the public in a false light that (1) would be highly offensive to a reasonable person and (2) was published with knowledge of, or reckless disregard for, its falsity. Romaine v. Kallinger, 109 N.J. 282, 294 (1988). Publication, falsity, and fault are established by the same proofs as the defamation claim, and the "highly offensive" element by the same proofs as the privacy claims.  False light, however, reaches further: by impersonating Onli and Dhryl outright—operating a counterfeit "Dhryl Anton—Founder & CEO" profile and an "official" Onli page, and posting fabricated statements in their names—Griffin attributed to them words and conduct that were never theirs.  (Exs. C, K, L; Verified Compl. ¶ 77).  Casting a person before the public as the author of a racist or fraudulent message he never made is practically the model of a false-light injury, which cements Dhryl's likelihood of success for a false light cause of action.

**Appropriation of name and likeness (Dhryl and Michaela).**  The appropriation branch requires that the defendant (1) appropriated the plaintiff's name or likeness, (2) without consent, (3) for the defendant's use or benefit, and (4) causing damage; liability attaches where the defendant appropriates "the commercial or other values associated with the name or the likeness." Faber v. Condecor, Inc., 195 N.J. Super. 81, 88 (App. Div. 1984).  Griffin took Dhryl's name, likeness, and biographical details, plainly without consent, to build the counterfeit "Dhryl Anton" LinkedIn profile and YouTube channel, which contained outrageously false offensive content.

20

Griffin also used Michaela's likeness alongside that offensive content, such as the Onli channel banner and video thumbnails. (Exs. C, K, L; Verified Compl. ¶¶ 79–80).

Griffin plainly committed this appropriation for his own benefit: using them to create the impression of legitimacy and authenticity in his fake pages, which would in turn enhance the "value" of his extortionate enterprise by wielding their stolen persona for additional leverage in his demands. The resulting and ongoing injury to Dhryl and Michaela's reputation is self-evident.

**Intentional infliction of emotional distress (Dhryl and Michaela).** Griffin's campaign also supports a claim for intentional infliction of emotional distress, which requires (1) intentional or reckless conduct, (2) so extreme and outrageous as "to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," (3) proximate causation, and (4) emotional distress "so severe that no reasonable person could be expected to endure it." Buckley v. Trenton Saving Fund Society, 111 N.J. 355, 366 (1988). The first two elements are plainly met. Griffin himself has admitted to intentionally using racism for the avowed purpose of tormenting Dhryl. (Ex. F; Verified Compl. ¶¶ 35, 83) (admitting that he employs racism because he believed it would get under Dhryl's skin). As for the second element, Griffin's conduct—circulating racist depictions of Dhryl and his purported child, branding Dhryl as a pedophile in images sent to the Antons' own relatives, opening fake Dhryl accounts on pornography sites, publishing their home address, and surveilling that home by drone—is outrageous by any measure. (Exs. B, C, G, H, K; Verified Compl. ¶ 84). Conduct that deliberately exploits race and children to wound parents goes far beyond any bounds of decency. Griffin's most recent escalation only sharpens the point. By implying that Plaintiffs may be subject to dark web bounties and "swatting," Griffin has now raised the prospect of physical violence against

21

Plaintiffs.  That conduct, layered atop a harassment campaign built on targeting race and family members, is outrageous in the extreme.  (Exhibit M; Verified Compl. ¶¶ 38–40).

Establishing causation and distress is equally straightforward. The severity of Dhryl and Michaela's distress is established through sworn statements (*see* Verified Complaint, ¶¶ 27, 84–85); Griffin's more recent implications of potential violence against Dhryl and Michaela only deepened that distress.  (*See* Verified Complaint, ¶¶ 27, 84–85).

## II.  Plaintiffs will Suffer Irreparable Harm Absent an Injunction

Plaintiffs satisfy the second factor on two independent grounds.  First, the Lanham Act supplies a rebuttable presumption of irreparable harm on a showing of likelihood of success. 15 U.S.C. § 1116(a). Onli has now made that showing, so the presumption applies, and Griffin, who has engaged in rank extortion over his infringement, cannot possibly rebut it.

Second, the harm is irreparable in fact.  Counterfeit channels that pass for Onli's official presence strip Onli of control over its own mark, message, and reputation, which is an injury courts have long recognized cannot be measured in damages.  *See* Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 726 (3d Cir. 2004).  The loss is acute here for three reasons.  The counterfeits pair Onli's mark with racist and defamatory content, tarnishing the brand every day they remain reachable. They operate during an active fundraising and regulatory period, when Onli's control of its public identity matters most. And they keep returning: Griffin rebuilt both the YouTube channel and the LinkedIn page within days of their removal, which shows the harm is ongoing and will continue without an order. (Verified Compl. ¶¶ 4, 36).  A defendant's demonstrated intent to keep infringing is itself strong evidence that legal remedies are inadequate.

22

## III.   The Balance of the Equities Favors Plaintiffs

The third factor weighs the harm to Plaintiffs against any legitimate harm an injunction would cause Griffin. Here, the balance is utterly lopsided.  Onli stands to lose control of its intellectual property and identity, Dhryl and Michaela have likewise lost control of their online identities. Griffin has no legitimate interest in any of the conduct the order would restrain.  It is indisputable that Griffin has no right to use Onli's mark or copy its works, or to impersonate Plaintiffs or disclose their sensitive and private information. The proposed injunction is narrowly tailored to impair only Griffin's unlawful acts, and it would leave him free to engage in lawful speech about Onli in his own name. It therefore imposes no cognizable hardship.

## IV.   An Injunction Serves the Public Interest

Likewise, the fourth factor overwhelmingly favors Plaintiffs' request for injunctive relief. The public has a recognized interest in the enforcement of intellectual property law and in not being deceived about the source of goods and services.  *See* Kos Pharms., 369 F.3d at 730.  That interest is squarely engaged where, as here, counterfeit channels are built to be mistaken for a real company and individuals. The well-recognized public policies against racism, computer fraud, doxing, and extortion likewise favor the Plaintiffs.  Because the requested injunction is narrowly tailored, it serves the public interest without burdening it.

## VII.   The Proposed Injunctive Relief is Proper and Readily Enforceable

A temporary restraining order is an extraordinary remedy, and its terms must be specific enough to tell the restrained party exactly what he may not do.  Fed. R. Civ. P. 65(d).  Onli has drafted its proposed order to meet that standard.  Each prohibition is tied to a claim and to conduct already shown on this record:

23

(1) **Trademark.** Griffin and those acting in concert with him are enjoined from using the ONLI mark, the "Onli" name, Onli's logo or tagline, or any confusingly similar variation, in connection with any website, social-media account, channel, page, or profile, or otherwise to represent that Griffin or any account he controls is associated with Onli.

(2) **Impersonation.** Griffin is enjoined from creating or operating any account, channel, page, or profile that purports to be Onli or any Onli executive, or otherwise using the name or likeness of Dhryl Anton, Michaela Kathrens Anton, Ian McFall, or any other Onli officer or employee in content, communications, or media posted online.

(3) **Domains.** Griffin is enjoined from registering, using, trafficking in, or offering to sell any domain name that incorporates the ONLI mark or the name of any Plaintiff or Onli executive—including onlitoken.com, dhrylanton.org, ianmcfall.org, and katherineanton.com, and any other such domain identified in the order. Griffin must preserve those domains and the associated registrar accounts and is prohibited from transferring, selling, or relinquishing them to anyone other than the respective Plaintiff pending further order of the Court.

(4) **Fake Accounts and False Statements.** Griffin must disable the counterfeit YouTube channel and LinkedIn page identified in the order, and any other counterfeit Onli account within his control, and take the steps within his power to remove them. Griffin is also enjoined from knowingly making false statements (including AI-generated content created at Griffin's direction) concerning Plaintiffs.

(5) **Private information and Harassment.** Griffin is enjoined from publishing or otherwise utilizing the home address, personal contact information, financial-account information, or other private personal information of the Anton family or any Onli employee.

24

(6) **Computer Systems.** Griffin is enjoined from accessing or attempting to access, without authorization, any Onli computer, system, network, or account, including its GitHub repositories; from using, transmitting, publishing, or disclosing any password, credential, "secret," or other confidential information obtained from those systems; and from any further threat or demand for payment concerning such access or information. Griffin must also identify and return to Plaintiffs, and must not destroy, any such credential, secret, or information within his control.

(7) **Preservation.** Griffin must preserve, and is prohibited from deleting, transferring, or altering the copied Onli materials or any files, data, or communications concerning Plaintiffs' claims against him unless and until those materials are provided to Plaintiffs.

(8) **Threats and Safety.** Griffin is enjoined from threatening, and from committing, soliciting, or encouraging any act or communication intended to cause or threaten physical harm to Dhryl Anton, Michaela Kathrens Anton, or any Onli officer or employee, or to place any of them in reasonable fear for their physical safety, including by directing or facilitating any third party to do so.

The injunction is thus narrowly tailored to restrain illegal conduct, not viewpoints; every prohibition addresses Griffin's use of Onli's mark, works, identity, private information, systems, or threats to Plaintiffs' physical safety, and none restrains him from stating his opinion of Onli in his own name. Furthermore, each term is concrete enough to enforce. A third party reviewing the order could tell whether a given account, post, or domain falls within it.

**Security.** Rule 65(c) permits the Court to set security in an amount it "considers proper," and the Third Circuit has long recognized that this discretion includes requiring only a nominal bond—or none at all—where the balance of the equities weighs overwhelmingly in favor of the

25

party seeking the injunction.  <u>Temple Univ. v. White</u>, 941 F.2d 201, 219–20 (3d Cir. 1991); <u>Elliott v. Kiesewetter</u>, 98 F.3d 47, 59–60 (3d Cir. 1996) (district court may dispense with security upon specific findings that the equities weigh overwhelmingly in the movant's favor). This is such a case. Griffin has no legitimate interest in any of the enjoined conduct; the order restrains only unlawful acts; and there is accordingly no measurable harm against which a bond would protect. Responding to Griffin's harassment has imposed financial hardship on Plaintiffs and jeopardized future income.  (Ex. D; Verified Compl. ¶ 33).  Accordingly, Plaintiffs respectfully submit that the Court waive the requirement for security or otherwise require only a nominal bond.

**Notice and Timing.**  Plaintiffs will serve this application on Griffin at his known email address **immediately** after filing and will ensure physical delivery via overnight mail the following day, so that the Court may proceed on notice to Defendant pursuant to Fed. R. Civ. P. 65(b). Griffin has repeatedly communicated with Plaintiffs more than a dozen times using the email "tom@thegrif.net," up to and including the date of this filing. (Verified Compl. ¶ 24; Exs. E, M). Accordingly, we ask that the Court consider email service to be sufficient for purposes of Rule 65 notice and grant the requested temporary restraints as soon as possible.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the proposed order to show cause, grant a temporary restraining order in the terms set out above pending a hearing, and after that hearing enter a preliminary injunction on the same terms.

Respectfully submitted,

Dated: June 29, 2026

**WEINER LAW GROUP**
*Attorneys for Plaintiffs*

By: _____

Christopher J. Seelinger, Esq.
629 Parsippany Road
Parsippany, New Jersey  07054
(973) 403-1100
cseelinger@weiner.law

27