Thomas Griffin
Defendant, Pro Se
76 Oakwood Village, Apartment 6
Flanders, NJ 07836
(201) 259-8860
tom@thegrif.net

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| THE ONLI CORPORATION, DHRYL ANTON, and MICHAELA KATHRENS ANTON,<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS GRIFFIN,<br><br>Defendant. | Civil Action No. 2:26-cv-07916 (JKS) (SDA)<br><br>Hon. Jamel K. Semper, U.S.D.J.<br>Hon. Stacey D. Adams, U.S.M.J.<br><br>**DECLARATION OF THOMAS GRIFFIN UNDER 28 U.S.C. § 1746 IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

I, Thomas Griffin, declare as follows:

1. I am the Defendant in this action, appearing pro se. I make this declaration on personal knowledge and submit it in opposition to Plaintiffs' application for a preliminary injunction (ECF No. 2), converted into a motion under Paragraph 8 of the Consent Order (ECF No. 11). The exhibits described below are true and correct copies of the documents they are identified as, printed by me from my own email, messaging, and service accounts unless otherwise stated.

2. I have worked as a technology consultant for more than twenty years in the legal, healthcare, transportation, and information-security sectors. I have never sought employment with The Onli Corporation or any affiliated entity, and I have never been terminated, disciplined, or warned by any employer for posting videos online. I have never had credentials to, or access to, any non-public computer system, network, or account of The Onli Corporation. The only access I have ever been given in connection with Mr. Anton or any of his companies is a developer seat I was given in February 2022 on an Apple Developer account belonging to MusicTray, Inc., a different company Mr. Anton had founded earlier, in connection with a software demonstration Mr. Anton presented to me and another person at that time. That seat was never revoked. It remained in place until July 10, 2026, when I wrote to Plaintiffs' counsel: "they still have my account listed as a developer on one of their past Apple Developer accounts," and listed it among the security exposures I had reported to Plaintiffs, together with the public Vimeo videos and the public GitHub repositories. Plaintiffs' counsel replied that morning: "I will pass the rest of this along in the meantime." The seat was removed after that notice. I did not use that seat at any time after February 2022, and it never provided access to any system, repository, or account of The Onli Corporation.

**A. The YouTube channels**

3. On May 29, 2026, I created the YouTube channel titled "The Onli Corporation Video Vault," handle @onlicorporation. The channel carried a music album of ten songs titled "Actual Possession: Off-Ledger and On the Run," each described as parody and satire in its video description, and copies of twenty-nine promotional videos that The Onli Corporation had itself posted publicly on Vimeo between September 2021 and May 2026. The Vimeo videos were reproduced unaltered; I wrote the titles and descriptions, which state my opinions of the company's claims, including my opinion that the products depicted were never released to customers.

4. On June 13, 2026, at 5:15 a.m. Eastern, I received a notice from YouTube stating that, after a trademark complaint, "the following content has been removed from YouTube: Channel: The Onli Corporation Video Vault." Exhibit 1 is that notice. From that moment the channel and every video on it were unavailable to the public. I have not republished the @onlicorporation channel. The music album and eight of the Vimeo videos were later uploaded to a second channel, described in the next paragraph, which I made private on June 29, 2026.

5. On June 16, 2026, I created a second YouTube channel under the handle @dhryl, on which I uploaded the same music album and, on June 16 and 17,

two live streams, and on June 18 eight of the Vimeo videos and two other videos. On June 29, 2026, before Plaintiffs filed this action, I set every video on that channel to private, where each has remained; no video on the channel can be viewed by the public. The channel has published nothing since. I did not delete the channel, for two reasons: so that its records would be preserved, and so that the handle @dhryl—Mr. Anton's given name—could be transferred to Mr. Anton if he wishes to take control of it. On July 9, 2026, I told Plaintiffs' counsel in writing that I had not deleted the channel, that I had set it to private, and that I would transfer administrative rights to it to an email address Mr. Anton controls if he wanted the handle. Plaintiffs' counsel has not objected to the channel's retention at any time since, and no application concerning it has been made under Paragraph 10 of the Consent Order. Until September 28, 2026, the channel page itself—the title, profile image, and description shown in Plaintiffs' Exhibit L (ECF No. 1-1 at 48 (PageID 70))—remained visible to anyone who navigated to it, although no video on it could be viewed. On September 28, 2026, I removed that title, image, and description; the page now displays a placeholder name that refers to no Plaintiff, no image, and no content. Exhibit 11 at 1 is a capture of the page as it appears to a visitor who is not signed in, made later that day. I will transfer the channel to Mr. Anton on request.

6. The video described in Plaintiffs' Exhibit L as a "Maury Povich" video was uploaded to YouTube on May 17, 2026 and immediately set to unlisted—a setting under which a video does not appear in search results or on any channel page and can be reached only by its direct link. The link was shared by iMessage to a group conversation that included Mr. and Ms. Anton and telephone numbers that appeared in Google search results for The Onli Corporation. I also included the link in my June 13, 2026 email that Plaintiffs filed as Exhibit E (ECF No. 1-1 at 19 (PageID 41)). It was never listed publicly.

**B. LinkedIn and the other profiles**

7. On June 11, 2026, I created a LinkedIn company page for "The Onli Corporation" and a LinkedIn profile under the name Dhryl Anton. LinkedIn removed both under its Professional Community Policies on June 22, 2026. Neither has existed since.

8. The Scottsdale address shown on the company page (Plaintiffs' Exhibit K, ECF No. 1-1 at 42 (PageID 64)) is the principal office address and mailing address that Dhryl D. Anton, as incorporator, filed with the Wyoming Secretary of State for ONLI.AI, INC., a Wyoming profit corporation formed on November 14, 2025. Exhibit 2 is the Wyoming Secretary of State's Filing

Information page for that entity, printed by me on September 6, 2026. I took the address from that public filing.

9. On June 17, 2026, I registered usernames incorporating Mr. Anton's name on several websites, including X, Reddit, SoundCloud, OnlyFans, and Snifffr. I never posted any content, photograph, biography, or message on any of those accounts. On June 29, 2026, I deleted all of them and told Plaintiffs I had done so.

**C. The domain names**

10. On May 27, 2026, I registered the domain names listed in Plaintiffs' Exhibit G (ECF No. 1-1 at 25 (PageID 47)). Twelve of the twenty-six names are criticism names—onlibullshit, onliclassaction, onlilawsuit, dhrylscam, and their .info and .link variants; the others incorporate the names of Mr. Anton, Ms. Anton, or Mr. McFall, or the Onli mark (onlitoken). I registered them to host commentary about the company and its principals. No domain was ever used to sell any product or service.

11. On June 1, 2026, at 6:58 a.m., I wrote to Mr. Anton that I would transfer the domains to him for four times the total of four bitcoin payments—the same payments listed in the table Plaintiffs later filed as part of their Exhibit G (ECF No. 1-1 at 27 (PageID 49))—which I believed Mr. Anton had made to a third party, through escrow.com, conditioned on mutual confidentiality and non-

disparagement agreements. At 10:54 a.m. Mr. Anton replied: “So $8000 / You sell me the domains / You stop with the videos / I don’t want any documents. – / You will have to give me your word and trust we will keep our word. / Done.” At 11:24 a.m. he wrote: “To be clear / I am not paying out of fear of exposure- there is no there there / I am paying you because your operation taught us an important lesson we clearly needed and there are real holes in our security processes at $8k we needed the pain.” At 11:30 a.m. I withdrew: “I don’t think you get it. I’m taking the deal off the table. . . . I don’t want to hear from you. Stay away.” At 12:51 p.m. I wrote: “If you want to paper a deal have your lawyer contact me. If not, so be it.” Exhibit 3 is the exchange of June 1 and June 2, 2026 under the subject “An Olive Branch,” as printed from my mailbox; the thread’s first message is my 6:58 a.m. reply to an earlier message from Mr. Anton.

12. On June 1, 2026, at 5:35 p.m., Mr. Anton identified his lawyers as Jay V. Surgent of Weiner Law Group, and at 6:45 p.m. copied Mr. Surgent and Paul Grossman of that firm, writing: “This is the firm that will be handling it. Let’s not have any more contact.” On June 2, 2026, Mr. Grossman telephoned me. He said: “Our client would like to just resolve this matter with you and I think you asked them earlier this week for $10,000 in exchange for the various different domain names that you’ve got.” I answered: “I told him I would sell him the domain

names I purchased, alright, But I'm not interested in resolving anything with him. I already contacted the FBI." Exhibit 4 is my verbatim transcript of that call, which I recorded. The $8,000 figure was Mr. Anton's; the $10,000 figure was Mr. Grossman's. Supplement 1 to the Scottsdale Police Department report (Exhibit 5 at 5), which summarizes my June 28 telephone conversation with Officer Kiter, records me as saying I "would sell the domains to them for $10,000." That summary is not accurate. I did not propose a $10,000 price to the officer or to anyone. The first time that figure was put to me was by Mr. Grossman on June 2; the report's second page (Exhibit 5 at 2) records that Ms. Anton had used the same figure in her June 1 report, before that call, and I do not know its source. My own email of June 29, 2026, at 3:44 a.m., described the lawyers' call the same way at the time: "having the NJ defense attorneys call me attempting to resolve the issue by buying $10k of domains." Exhibit 7 at 1. Supplement 2 (Exhibit 5 at 7) records that I "proposed to sell these domains back to Dhryl for approximately $8000.00"; that figure was Mr. Anton's, from his June 1 message quoted above. At 11:37 a.m. on June 2, before Mr. Grossman's call, I wrote to Mr. Anton and both lawyers: "i informed Dhryl last night i was not interested in any deal with him. . . . Please do not attempt to interfere with me referring this matter to the authorities." Exhibit 3.

13. The second page of Plaintiffs' Exhibit I (ECF No. 1-1 at 33 (PageID 55)) is an image of a listing sheet I exported from my account at Unstoppable Domains, the registrar. It lists each domain, its listing status, and the asking price I had set on the registrar's public sale pages: $3,500 for each .com and .org name, $50 for each .info name, and $100 for each .link name. The domains were listed for sale publicly through the registrar's landing pages at those prices. On June 28, 2026, at 8:46 p.m. Eastern, I sent Mr. and Ms. Anton an email with the subject line "Onli Domains - Get Them While They're Still Hot," which stated that "the domains you recently showed interest in are all buyable and financeable on UnStoppable Domains" and that they "[c]ould probably work through a domain agent to get some sort of volume discount on things," and which attached two files: the image reproduced at PageID 55, and a CSV file listing, for each of the twenty-six names, a buy-it-now price of $4,000 and lease-to-own terms of 18 months with 35% down. The CSV file was a separate export from the registrar's account portal; the $4,000 figure in it was an error, and the prices at which the names were actually listed were those shown in the image. That email was an offer of the domains to Plaintiffs at the listed prices. The "LTO Offered" column and the "Up to 40% Discounts Available on Volume Purchases" banner are the registrar's standard lease-to-own and volume-discount features, which appear on

every listing that uses them; I did not write that text. No domain was ever sold to anyone; eighteen have been transferred to Plaintiffs without payment and the remaining eight are held for transfer to them, as described in the next paragraph.

14. On July 14, 2026, before the Consent Order was entered, I moved the registrar account holding the domain names to a dedicated mailbox created for that purpose, sent Plaintiffs' counsel working credentials for both the registrar account and that mailbox, and set out the steps by which Plaintiffs could take sole control of the account, and of every domain in it, that same day by signing in and changing the password. On July 27, 2026, the Court entered the Consent Order, Paragraph 2(c) of which recites that I had offered, and Plaintiffs had accepted, transfer of the domain names to Plaintiffs. At Plaintiffs' counsel's request on a July 28 call, I reissued the credentials on July 30, 2026. No one signed in, and no one changed the password: the username and password I issued in July still open both the registrar account and the mailbox today. Between July 27 and September 18, 2026, Plaintiffs did not identify a receiving registrar or account. While the transfer was pending, I set the registrar listing price of each name to $10,000 so that no third party could purchase one before Plaintiffs took it; none was sold at any price. (The registrar does not permit a listed name to be removed from its marketplace; on September 28, 2026, I lowered the eight .link names to the

registrar's $20 minimum for the reason described below.) On September 18 and again on September 21 and 22, 2026, I asked Plaintiffs' counsel in writing for the receiving registrar and account email so that transfers could be initiated, and on September 21 I sent the registrar authorization codes for every domain. On September 22, 2026, Plaintiffs' counsel wrote: "I had not requested the auth codes from you because I was still waiting for a green light from my clients that they were ready." On September 23, 2026, the registrar notified me that transfer requests had been received for the domains. On September 25, 2026, Plaintiffs' counsel confirmed: "Mostly. All of the .link domains got errors on the transfer." Every .com, .org, and .info domain on the list has been transferred to Plaintiffs. The eight .link domains did not transfer; the registrar returns an error when I attempt to retrieve their authorization codes, and I do not know why. On September 28, 2026, I wrote to Plaintiffs' counsel offering two ways to complete them: Plaintiffs may purchase each name through the registrar at its minimum listing price of $20, which I set for that purpose because the registrar does not allow the listing to be removed, and which I have offered to cover if a way exists, or Plaintiffs may open or identify an account at the same registrar and I will transfer the names to it within the registrar. Exhibit 13 is that thread, which includes the September 25 exchange quoted above. I will complete the .link

transfers by whichever route Plaintiffs choose. I hold no domain name containing the Onli mark or any Plaintiff's name that I have not already committed to transfer. Exhibit 12 is my letter to Plaintiffs' counsel of September 22, 2026, setting out this history and the steps that remained.

**D. The GitHub repositories**

15. On June 12, 2026, I found that source-code repositories belonging to the GitHub organization "OnliSyn" were publicly accessible on the internet: anyone, without an account, password, or credential of any kind, could view and download them. On GitHub, whether a repository is public or private is a setting chosen by the repository's owner or organization administrator; a public repository is served to any visitor without a login. I did not use any password, token, or credential to reach them, and no password, token, or credential was required.

16. Within hours, at 12:18 p.m. Eastern on June 12, 2026, I sent an iMessage to Ian McFall, Onli's Chief Technology Officer, stating: "you guys really need to button your stuff up - you can't be a company that goes around saying your whole bit is keeping stuff safe and then…well…yeah…" followed by a link to an asciinema.org recording showing a set of reports run against the public

repositories. I made no demand for money in that message or in connection with the repositories at any time.

17. The screen recording described in Plaintiffs' Exhibit J shows a script that downloaded copies of the public repositories, computed cryptographic hashes for the files, and ran two widely used open-source tools, TruffleHog and Gitleaks, which report whether any credentials have been committed to code. The purpose of the recording, and of the message to Mr. McFall, was to show Onli what was exposed so that it could be secured. I did not use, test, transmit, or publish any credential or secret found in those repositories, and I have never accessed any Onli system by means of any such credential.

18. Later on June 12, 2026, the OnliSyn repositories became private. On June 13, 2026, at 3:45 a.m. Mountain time, I wrote to Mr. Anton: "Some moves you're making are good - like shutting down open access to your source repos… though even when they are private, you still should not be storing secrets within them." Plaintiffs filed that email as their Exhibit E. ECF No. 1-1 at 19–21 (PageID 41–43).

19. I placed copies of the repositories on a GitLab instance at lab.dhryl.com. That instance was not publicly accessible: it required a username and password to view any content, and the repositories could be viewed only by a

single account I created for Mr. Anton under his email address, dhrylanton@gmail.com, and by me. The address lab.dhryl.com appears in my June 17, 2026 email (Plaintiffs' Exhibit G) for that reason: it identified where the copies were, behind a login that only Mr. Anton's account and mine could pass. On June 29, 2026, before Plaintiffs filed this action, I removed them from that server. I have preserved the archived copies, unaltered and unpublished, as Paragraph 2(f) of the Consent Order requires, and I have not accessed, used, or disclosed them since.

**E. The bank-account number and the aerial image**

20. The Onli bank-account number that appeared in a video description on the @onlicorporation channel was printed on an invoice that The Onli Corporation had issued to a third party, who provided the invoice to me. The description stated my opinion that the videos were used to persuade investors to wire money to that account. The number has not been published anywhere since the channel was terminated on June 13, 2026. On June 1, 2026, Ms. Anton told the Scottsdale Police Department that the banking information I had published was "outdated." Exhibit 5 at 1.

21. The image reproduced as Plaintiffs' Exhibit H (ECF No. 1-1 at 30 (PageID 52)) is a frame from a video I created in Google Earth Studio, a free

Google application that renders animated flyovers from Google's publicly available satellite and aerial imagery. I added the DJI logo and the heads-up-display graphics as overlays. I have never owned or flown a drone over, or otherwise recorded, the Antons' residence or any property of theirs. I sent the video by iMessage on May 18, 2026, to the group conversation described in paragraph 24 below.

**F. Plaintiffs' Exhibits F and G**

22. Plaintiffs' Exhibits F and G (ECF No. 1-1 at 23, 25–28 (PageID 45, 47–50)) are excerpts of a single email I sent on June 17, 2026 at 5:01 p.m. Exhibit 6 contains the first two pages and the final page of that email. The omitted pages 3 through 5 describe the network-security measures on my home network and the intrusion I reported to the police, and page 5 also contains the "What's Online So Far?" list and the list of domain names that Plaintiffs filed as Exhibit G (ECF No. 1-1 at 25–26 (PageID 47–48)); I will provide the omitted pages to the Court on request. The words "Crazy" and "Vindictive" quoted in Verified Complaint ¶¶ 2 and 35 appear in a list I introduced with the words "For those keeping score, on my personality bingo card I've got:". The items in that list are labels that had been applied to me in the course of the dispute; the list was not a description of my personality.

23. The 0.388 bitcoin figure quoted in Verified Complaint ¶ 34 appears in that email under the sentence: "I am willing to sell the domains and any Onli Corporation profiles in my possession for 4x what you paid the hacker you hired to attack me and release my information." It is the same price I had stated on June 1, 2026 ("Put 4x whatever you paid the Soviet into escrow.com and they're yours"), eleven days before the GitHub repositories came to my attention. The email also states: "I have been trying since May 31 to bring you to the table to resolve this," and "I'm willing to sign a settlement/release agreement with you, Katherine, Ian, and his Father with severe penalties should I not hold up my end of the bargain."

**G. The May 18, 2026 messages**

24. On May 18, 2026, I sent messages to a group iMessage conversation that included Mr. Anton, Ms. Anton, and several members of Ms. Anton's family. The messages included AI-generated images of Mr. Anton. No image from that conversation was published on any website, channel, or page. I sent no further message to any member of the Antons' family after May 18, 2026.

**H. My reports to law enforcement**

25. On May 22, 2026, my iCloud account was the target of a telephone and text-message phishing attack, and a device I did not own connected to the

account. Beginning May 24, 2026, my home network's public IP address was scanned from a host outside the United States, and on May 25 a person using credentials from a 2019 data breach logged into a decoy virtual machine I had set up for that purpose. I reported these events, and my belief that they were directed at me by Mr. Anton, to the Scottsdale Police Department on June 28, 2026. I had told Mr. Anton in writing on June 1 and 2, 2026 that I believed he had sent people to my home (Exhibit 3), and had told Mr. and Ms. Anton and their lawyers in writing on June 17, 2026 that I believed he was behind the phishing attack and the scanning of my network (Exhibit 6).

26. On Sunday, June 28, 2026, at approximately 5:46 p.m. Mountain time, Officer Simon Kiter of the Scottsdale Police Department telephoned me in response to a report I had made, and we spoke for about an hour. Officer Kiter recorded my account in a supplement to Report No. 2611085, time-stamped 1:45 a.m. on June 29, a report Ms. Anton had opened against me on June 1, 2026. Exhibit 5 is a copy of Report No. 2611085 with its three supplements, which I obtained from the Scottsdale Police Department by public-records request; the redactions in it were made by the Department before release, and I have made none.

27. On July 28 and 29, 2026, a Scottsdale police officer, Ada Lea, reviewed the materials Ms. Anton had submitted, spoke with Ms. Anton and Mr. Anton with their attorney on the call, and wrote that she "would be inactivating the case since I did not believe the information provided supported the extortion charge." Exhibit 5 at 7–8. Before that, on July 9, 2026, Officer Lea telephoned and interviewed me, and asked me for copies of the videos, which by then had been taken offline; I provided what she asked for. Her July 28 supplement, which describes the material Ms. Anton had uploaded, does not mention that call.

**I. The June 29, 2026 emails**

28. On June 29, 2026, at 3:44 a.m. Eastern, later on the night of my call with Officer Kiter, I emailed Mr. and Ms. Anton under the subject "Train is Leaving the Station." The email opened: "I know the brick left on the guy's floor mat was someone you hired - I doubt the neighbor report from tonight is also you, but if it is, know that things are about to graduate to the next level very soon." The brick and the neighbor report referred to incidents at my residence; the "next level" I referred to was the police involvement and the civil complaint described in the same email. The email continued: "In the spirit of trying to lower the temperature in to allow for cooler heads to prevail, please know that I have done the following: • set all YouTube videos to private (if I missed one, please let me

know) • removed Onli platform source code you had inadvertently published on Github from the Gitlab installation running on dhryl.com." It then described my call with Officer Kiter and the civil complaint I intended to file in Arizona. Exhibit 7 at 1.

29. At 12:25 p.m. Eastern the same day, I forwarded that email to Mr. and Ms. Anton with the message Plaintiffs filed as Exhibit M (ECF No. 1-1 at 51 (PageID 73)). Plaintiffs' Exhibit M reproduces my message but omits the forwarded 3:44 a.m. email beneath it. Exhibit 7 at 2 is the message as sent. Its first sentence reads: "I'll admit it - I was honestly (hoping?) expecting a thank you - or at least a nod - after I took all of the Onli content down."

30. At 12:51 p.m. Mr. Anton replied: "You could have stopped at anytime / You can't / You have 533 criminal offenses and counting, every threat, every email, is another offense and bounties are the most serious, as the detectives point out you incriminate yourself and coincidently provide all the evidence of your crimes / this is out of my hands / If I were you I would I would get an attorney / And stop your criminal activity." At 1:13 p.m. I replied, in part: "When did I ever threaten you? When did I ever create a bounty or reward foir doing anything to you, Katherine, or the baby? Which detectives? Why haven't they reached out to me?" The same reply, describing the civil claims I intended to

bring, ended: "And you will pay through the nose, period. Both of you." The reference was to civil damages. Exhibit 7 at 3–4.

31. The sentence in my 12:25 p.m. message that reads "I had a team of guys swatting a close friend of mine and their entire family over the twitter username @molly - and I saw firsthand how brutal these guys are" refers to work I did in 2020 for a friend, Dr. Jacob Reider, whose family was repeatedly targeted with false emergency calls ("swatting") by persons seeking to take over a Twitter username. I investigated those persons using publicly available information and provided my analysis to the United States Secret Service's Electronic Crimes Task Force. On December 19, 2020, Special Agent Matthew Luczak wrote to me: "This is extremely impressive work. It's shocking you were able to take this as far as you did with access to only civilian-facing data," and described the interagency notifications and inquiry he had opened as a result. Exhibit 8 is that email. The next sentence of my June 29 message—"USSS actually has jurisdiction over swatting because they consider it a domestic terrorism incident"—refers to what I learned in that matter. When I wrote that I was "most concerned about" how "dark web bounties work," I was describing my fear for my own safety, which I had reported to the police the night before.

32. The phrase "[e]veryone's inside the blast radius of this thing" in the same message is followed, in the same paragraph, by the words: "once we're in discovery, the two of you along with your pals will be answering my interrogatories, responding to my discovery requests (email dumps, phone records, financial transactions, etc...), and making yourself available to me for deposition." Exhibit 7 at 2.

**J. The Ferguson Declaration**

33. Plaintiffs' Exhibit D is a declaration of Scott Ferguson of Lucra Financial LLC dated June 25, 2026, stating that a Google Alert led him to the @onlicorporation channel "(reached by way of a forward / redirect from the domain dhryl.com)." ECF No. 1-1 at 17 (PageID 39). I purchased dhryl.com from Unstoppable Domains on May 27, 2026. From that date until 9:38 p.m. Eastern on June 16, 2026, the domain sat on the registrar's default nameservers and resolved to the registrar's parking page; no forwarding or redirect of any kind was configured anywhere. On June 16, 2026, at 9:38 p.m., Cloudflare confirmed that dhryl.com had been placed on Cloudflare, the first time any forwarding for the domain was configured; before that date I had configured none anywhere. Cloudflare's complete audit log for the zone, which I retrieved on July 27, 2026, records only two redirect objects in the life of the zone: a template rule sending

www.dhryl.com to dhryl.com, and a single page rule created at 02:07:26 UTC on June 17, 2026 forwarding the path dhryl.com/on-the-run to a YouTube music playlist on the @dhryl channel. The @onlicorporation channel had been terminated by YouTube three and a half days earlier, on June 13. Exhibit 9 comprises the registrar receipt, YouTube's notices of June 3 and June 5, 2026 (the June 13 termination notice is Exhibit 1), Cloudflare's activation email, the page-rule entry, and the complete audit log. I retrieved the audit log through Cloudflare's audit-log export and reformatted it for legibility without altering, adding, or removing any entry.

34. The two Lucra videos that appeared on the @onlicorporation channel were copies of "Lucra Cash" (vimeo.com/615357673) and "Lucra Demo" (vimeo.com/875762521), both uploaded to Vimeo by the account "Onli" (vimeo.com/onlistudio)—"Lucra Cash" about five years ago, as its page displays, and "Lucra Demo" on October 18, 2023—and both publicly viewable there today; the "Lucra Cash" page displays a public view count. Exhibit 11 at 2–3 is a capture of each page as it appeared on September 28, 2026. Neither Lucra video was among the eight Vimeo videos I uploaded to the @dhryl channel on June 18, 2026, or was ever uploaded to that channel; neither has been on YouTube since the @onlicorporation channel was terminated on June 13, 2026.

35. On September 22, 2026, I served on Plaintiffs' counsel a motion for sanctions under Rule 11(c)(2) directed to Verified Complaint ¶ 22, the Lucra clause of ¶ 44, the Ferguson Declaration, and the passages at ECF No. 2 at 8 and 15 (PageID 81, 88), with a letter identifying each contention and the records I contend contradict it. Exhibit 10 is that letter. As of the date of this declaration Plaintiffs have not withdrawn or corrected any of that material.

**K. Since June 29, 2026**

36. Since June 29, 2026, apart from retaining the @dhryl channel as described in paragraph 5 above, I have not created, operated, reactivated, or republished any website, account, channel, page, or profile using the Onli name or mark or the name or likeness of any Plaintiff; I have not published any content concerning Plaintiffs on any platform; and I have not communicated with Mr. or Ms. Anton except through their counsel and in papers in this action. Since the Consent Order was entered on July 27, 2026, I have not created, reactivated, or republished any account, channel, page, or profile described in its Paragraph 2; the one channel I retained is described in paragraph 5 above. Plaintiffs have filed no application under Paragraph 10 of that Order.

37. The restraint proposed at ECF No. 2-1 at 2 (PageID 106), subparagraph (b), would prohibit me from "using the name, likeness, photograph,

or biographical information of Dhryl Anton, Michaela Kathrens Anton, or any other Onli officer or employee in any content, communication, or media posted or transmitted online." I intend, in my own name and without any suggestion of affiliation with Plaintiffs, to discuss this lawsuit and my opinions of The Onli Corporation's business and public claims, including online.

38. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 28, 2026, at Flanders, New Jersey.

Thomas Griffin

## INDEX OF EXHIBITS

| | |
|---|---|
| **Exhibit 1** | YouTube notice, "YouTube Channel Removed: Trademark Policy Violation," June 13, 2026, 5:15 a.m. |
| **Exhibit 2** | Wyoming Secretary of State, Filing Information, ONLI.AI, INC., Filing ID 2025-001815645 (printed Sept. 6, 2026) |
| **Exhibit 3** | Email exchange, subject "Re: An Olive Branch," June 1–2, 2026 (Griffin / D. Anton / Weiner Law Group) |
| **Exhibit 4** | Transcript of June 2, 2026 telephone call from Paul Grossman, Esq., Weiner Law Group |
| **Exhibit 5** | Scottsdale Police Department Report No. 2611085 (June 1, 2026) with Supplement 1 (June 29, 2026), Supplement 2 (July 28, 2026), and Supplement 3 (July 29, 2026), redacted |
| **Exhibit 6** | Email of Thomas Griffin, subject "My Response," June 17, 2026, 5:01 p.m. (pages 1–2 and 6 of 6) |
| **Exhibit 7** | Email thread, subject "Train is Leaving the Station," June 29, 2026 (3:44 a.m.; 12:25 p.m.; 12:51 p.m.; 1:13 p.m.) |
| **Exhibit 8** | Email of Special Agent Matthew Luczak, United States Secret Service, to Thomas Griffin, Dec. 19, 2020 |
| **Exhibit 9** | dhryl.com records: Unstoppable Domains receipt (May 27, 2026, redacted); YouTube notices of June 3 and June 5, 2026; Cloudflare activation email (June 16, 2026); Cloudflare page-rule entry and complete audit log (98 entries) |
| **Exhibit 10** | Letter of Thomas Griffin to Christopher J. Seelinger, Esq., Sept. 22, 2026 (service of Rule 11(c)(2) motion) |
| **Exhibit 11** | Screen captures made September 28, 2026: youtube.com/@dhryl (public view); vimeo.com/615357673 ("Lucra Cash") and vimeo.com/875762521 ("Lucra Demo"), account "Onli" |
| **Exhibit 12** | Letter of Thomas Griffin to Christopher J. Seelinger, Esq., Sept. 22, 2026 (transfer of the Exhibit G domains: deadline and next steps) |
| **Exhibit 13** | Email thread, subject "We are good on domains?", Sept. 25, 2026 (1:03 p.m.; 3:11 p.m.) and Sept. 28, 2026 (11:15 a.m.) |